## DE VOS *v.* CAPLAN.

1. FALSE IMPRISONMENT—EVIDENCE—MATERIALITY.

In an action for false imprisonment for arresting plaintiff without a warrant, on the charge of breaking into a barn, of which defendant had taken possession, the jury finding that plaintiff had committed no offense, no prejudicial error was committed in admitting evidence that plaintiff's employer, whose tenancy had been terminated and who directed plaintiff to break in and remove his hay from the premises, subsequently sent the landlord a check for a half month's rent covering the period of time when the arrest took place.

2. APPEAL AND ERROR—WEIGHT OF EVIDENCE—NEW TRIAL.

On error, the objection that a new trial should have been granted, because the verdict was against the weight of the evidence, will not be considered if the court filed no reasons in writing for denying the motion.

3. FALSE IMPRISONMENT—FELONY.

Plaintiff's claim, supported by testimony, that he took only property that belonged to his employer when he broke into the barn of which defendant was tenant, required the submission of the case to the jury on that point.

Error to Kent; McDonald, J. Submitted February 14, 1911. (Docket No. 159.) Decided March 13, 1911.

Case by Cornelius A. De Vos by Herman Arnstein, his next friend, against Solomon Caplan for false imprisonment. Judgment for plaintiff. Defendant brings error. Affirmed.

*Benn M. Corwin,* for appellant.

*Lombard & Hext,* for appellee.

MOORE, J. This is an action for false imprisonment. The case was tried before a jury. From a judgment of $200 in favor of the plaintiff, the case is brought here by defendant by writ of error.

The defendant maintains, we quote from the brief:

"That the judgment should be reversed for the following reasons:

"*First.* That there was error in admitting evidence of a transaction which took place between two persons, neither of whom were parties to this suit, of matters which transpired after the commencement of this suit, which tended to mislead the jury as to the real issue.

"*Second.* That the judgment is against the great weight of the evidence.

"*Third.* That the trial judge should have directed a verdict for defendant on plaintiff's admissions."

The record shows that plaintiff in June and July of 1909 was at work for Herman Arnstein. He was then past 19 years of age. Mr. Arnstein was in possession of a barn which he had rented from one Crawford, who was himself a tenant. The board of health made an order in relation to the condition of the premises. A dispute arose as to whether it was the duty of the tenant, Crawford, or the subtenant, Arnstein, to comply with the order, and Arnstein refused to pay more rent until Crawford complied with the order. Thereupon Crawford without notice to Arnstein entered upon the premises. He

was a witness for defendant and testified among other things:

"I do not own the barn. I rent it from the owner and re-rented it to Mr. Arnstein. He had been in the barn five or six months. He was paying five dollars per month for it. I received a notice from the board of health to clean up that barnyard. I turned it over to Mr. Arnstein. I don't remember how it read. Mr. Arnstein did not have any talk with me about moving. I did not give him written notice to vacate. I went there and simply put his stuff out when he would not pay rent. I saw this young man there—his driver; I threatened to hit him if he did not attend to his own business. I insisted they must get out of the barn. I took the harness and other things and put it all outdoors there in a pile. After I had done that on the 23d day of July I wrote him a notice, asking for a month's rent. I did it because I was entitled to it even though I had put him out of the barn.

"Q. You had already rented it to this other man?

"A. After he had it about a half a month, before I rented it to this man.

"Q. This says to the 22d of June.

"A. Well, that is all right. According to law, as I understand it, if you stay overtime in a place and your rent is not paid, you are entitled to draw a month's rent. I wanted him to pay a full month's rent, although I had rented it to another man, from the 2d of July. I asked him for it, but I did not get it. I got a check from him some date for $2.50; I did not pay any attention to what was written on it. I just saw there was $2.50, and I took it down to the bank and got the money. I don't know how much hay there was upstairs at that time. I knew it belonged to Arnstein when I locked up that barn. There was no straw there under the stairs to my knowledge. I never saw any there downstairs; there was a little upstairs under the hay. I don't know what they were using it for."

Crawford rented the premises to defendant who is in the same business as Arnstein, and Mr. Caplan caused his horses and vehicles to be put in the barn, and endeavored to keep the lower part locked.

It is the claim of plaintiff that by direction of his employer, another employé, himself, and a drayman went to

the barn, the other employé drew the staple and they proceeded to get a load of hay from upstairs, but the dray would not carry it all. The defendant who is a witness on his own behalf as to this occasion, on the cross-examination, testified in part of follows:

"I know there is a stairway that goes up into the loft. I first went up that stairway on Monday morning about 9:30, there was no one there, but when I came to the barn, as I approached near the barn I saw De Vos and another man with a load of hay, and as they saw me I guess I frightened them, they got on their wagon and went away. I did not say anything. He jumped out from the door on the hay and they went away, and I went into the barn and went upstairs. That hay belonged to Mr. Arnstein.

"*Q.* And he had a right to go there and get it?

"*A.* Yes; but he had a right to get scared when he saw me, didn't he?

"*Q.* Why would he get scared when he saw you? Is there anything about you that would frighten anybody?

"*A.* No, I don't think that from me. I thought they were frightened because they broke in without asking me for the key—to get in there to remove the hay. They pushed the door open on Monday. I went up there to examine it. They already had their hay out. There was no lock on there; it was nailed on the inside, I saw the nails.

"*Q.* Do you mean to say they broke open that barn on Monday?

"*A.* They pushed that door open on Monday."

He further testified that he nailed the door. The plaintiff, the other employé, and the drayman came back the next day by direction of his employer, and the door to the upstairs was pried open, and the plaintiff claims that nothing was taken out of the barn except what belonged to Mr. Arnstein. The defendant claims that some of his straw and oats were taken on this occasion. Both visits to the barn by plaintiff were made in the daytime. The defendant called up the police department and informed them his barn had been burglarized. One of the policemen was detailed to work on the case. He testified that

he learned that a larry, as he called it, with two or more men had taken the things away from the barn.  He soon found De Vos who he says, after some hesitation, admitted he was one of the persons who broke into the barn.  The officer testified in part as follows:

"I was directed to go from police headquarters and make the investigation.  I went to Mr. Caplan's place of business on South Division street and he informed me where the barn was on the alley off Sheldon street.  He advised me that his barn had been broken open and some of his hay stolen, and I went up and looked into the matter.  I inquired around in the neighborhood and found that a larry had been there and got a load of hay.  I did not get any of that information from Caplan.  I went up to the barn on Waverly place and found young De Vos there.  He was just taking care of his horse.  I had a talk with him.

"*Q.* What did you ask him at that time?

"*A.* I asked him in regard to this barn being broken open on the alley on Sheldon street; also as to the taking of the hay and feed from the barn.

"*Q.* What did he say to you then?

"*A.* Well, after some hesitation he told me that he went to the barn, and, as I said before, I learned that there was a dray of some kind, and he told me there was another party with him, but said he didn't know who it was, and that he went there, broke into the barn and got the stuff.

"*Q.* He told you that he got the hay?

"*A.* Yes, sir.

"*Q.* Did you know or have any idea at that time that there was anything else involved except the hay?

"*A.* Well, as I was told by Mr. Caplan, that his feed was gone also.

"*Q.* Was there anything said by Mr. De Vos about any feed, except about the hay?

"*A.* Well, I don't think— I would not say positively as to whether I was specific in mentioning any oats, corn, or grain.

"*Q.* You were simply interested in finding out if he was the man that had been up there?

"*A.* Yes; and took the stuff.

"*Q.* And he said he was?

"*A.* Yes, sir.

"*Q.* Then what did you do with him?

"*A.* Well, we walked down State street; walked Jefferson avenue. I glanced around and seen Mr. Arnstein and a party of friends coming out of the boarding house, and De Vos had told me previous to this time that Arnstein sent him up there to get the stuff, and that is why he broke into the barn, and I thought—

"*Q.* Just a moment. He told you then that this hay belonged to Arnstein?

"*A.* Yes.

"*Q.* Then from there you took De Vos down to Caplan's?

"*A.* Yes.

"*Q.* Now, did you have a talk down at Caplan's with Caplan about it?

"*A.* Yes.

"*Q.* What did Caplan tell you to do with him?

"*A.* Of course it is my asking questions that caused him to tell him. Now, I, of course, told Mr. Caplan the circumstances as I had found them with the young man; he had admitted having broken into the barn, and having broken the door off upstairs and taken the stuff.

"*Q.* Then did you ask Caplan what you should do with him?

"*A.* Yes; I asked Mr. Caplan—told him the circumstances, and asked him if he would make complaint. He said he would. He said to look him up, and he would make complaint. * * * I took the young man to police headquarters. I think I called the wagon right from the store there, or the dyehouse, I am not positive, but I think I did. He was put in the wagon out on Division street. I do not remember whether there was a crowd or not, it is just a common occurrence, I didn't think anything about it. I got in the wagon with him and went to headquarters. He was not taken to any officer. I did the business with him myself, all that was done at that time. I told him to go home and come back in the morning. It was about half past 6 in the evening that this took place. I think I called Mr. Caplan up and told him he could get the warrant out without the young man being locked up, because his people living here, and his being at that age, I did not think it was necessary he should be locked up overnight. I did not appear in the morning. That terminated my connection with the case."

It was the claim of defendant that in his notification to the police department, and in his direction to the policeman, he acted in the utmost good faith.

With this general statement, we may take up the first proposition of counsel. Did the court err in admitting the evidence in relation to a notice sent by Mr. Crawford to Mr. Arnstein, and the sending of a check of $2.50 from Mr. Arnstein to Mr. Crawford which was receipted, both of which were sent after this suit was commenced ? The court was of the opinion that this testimony was of very little importance. When Mr. Crawford was on the stand he was cross-examined upon the subject without objection, and his cross-examination, some of which we have quoted, showed the same state of facts as disclosed by the notice and check. Indeed there was no serious dispute about how Mr. Crawford got possession of the barn and to whom and how he gave possession, nor was there any serious dispute about how plaintiff, the other employé, and the drayman got into the barn to get the hay. The serious dispute was whether only Arnstein's things were taken or whether some of defendant's straw, oats, and feed were taken as claimed by defendant. The judge charged the jury that it was admitted the barn was broken open. The judge charged the jury in part as follows:

"The law guards the rights of citizens from unlawful arrest and permits it only upon warrant, or without a warrant by an officer when a breach of the peace has been committed in the presence of the officer, or by an officer in cases of probable cause to believe a felony has been committed. Of course, the private individual has no such authority as an officer, but a private individual can arrest or cause the arrest of the person if a felony is committed and he has reasonable cause to believe that that person committed the felony.

"So that, in this case, the fact that the defendant caused the plaintiff's arrest being undisputed, it is simply left for you to determine, *first*, was a felony committed ? and, *second*, did the defendant have probable cause to believe that the plaintiff committed it ?

"Taking up these questions in their order, you will first consider, Was a felony committed? Our statute provides:

"'That every person who shall break and enter in the daytime any barn, with intent to commit the crime of larceny, shall be punished by imprisonment in the State's prison not more than five years,' etc.

"Another section of our statute says that the term 'felony' shall be considered to mean an offense for which the offender, upon conviction, shall be liable by law to be punished by death or by imprisonment in the State's prison; and by the terms of these statutes it would be a felony for one to break and enter in the daytime any barn with intent to commit the crime of larceny. In this case, it being admitted that the barn was broken and entered in the daytime, if the defendant's property, or any part of it, were stolen, then I instruct you that a felony was in fact committed. It is immaterial whether or not it was committed by the plaintiff; it is sufficient for the purpose of this case if a felony was actually committed.

"To constitute larceny, there must be a taking of the goods of another out of that other's possession and against his will or consent. It is the wrongful taking and carrying away of the goods of another, with a feloninous intent to convert them to the use of the offender. So, in this case, the barn having been broken into, if it was done with an intent to steal, or if any of the defendant's property was taken by any one under such circumstances as would make the taking larceny, then a felony was in fact committed. As I said, it makes no difference whether the plaintiff or some other person took the goods; the question is, Was a felony committed by any one? and you will determine this question under the rules and definitions that I have given you and from all of the evidence in the case. If a felony was in fact committed, whether by the plaintiff or some other person, and the defendant had probable cause to believe that the plaintiff was the party who committed it, he would have a right, as I said, to cause his arrest. If you find that a felony was not committed, your verdict should be for the plaintiff. If a felony was committed, the next question for our determination is, Did the defendant have probable cause to believe that the plaintiff committed it? 'Probable cause' is defined to be a reasonable ground of suspi-

cion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense of which he is charged. On this subject of probable cause the question is not whether the plaintiff was or was not guilty of a felony, but what did Caplan actually believe, and have reason to believe, at the time he told the officer to arrest him.

" Under the circumstances of the case, it is unnecessary that I should further define or explain to you what would constitute probable cause, because there is no dispute about the information upon which the defendant acted at the time he directed the plaintiff's arrest. The information came from the plaintiff himself, and I think the witnesses substantially agree upon what was said at that time in the defendant's presence. That evidence being undisputed, it becomes a question of law for the court as to whether or not the defendant had probable cause to believe that the plaintiff committed a felony, or if one was committed; so I instruct you, as a matter of law, in view of the undisputed testimony, that the defendant did have probable cause, and that leaves for your determination simply the question as to whether or not a felony was in fact committed. If you find that a felony was committed, the plaintiff cannot recover, and your verdict should be for the defendant, no cause of action. If, on the other hand, you find that a felony was not committed, the plaintiff can recover, and, if you so find, you will then proceed to determine the plaintiff's damages."

*Second.* Was the judgment against the great weight of evidence? A motion was made for a new trial, chiefly upon the ground that the verdict was against the weight of evidence. The record is that "said motion was denied without filing any reasons." Under our practice we will not consider that branch of the case further.

*Third.* Should the trial judge have directed a verdict for defendant on plaintiff's admissions? We quote from the brief of counsel:

" Every fact necessary to authorize an arrest by a private citizen, and which would constitute a complete defense to this action was admitted on the trial by plaintiff

and corroborated by the great weight of evidence. Plaintiff admitted breaking into the barn or that he was present when it was done and went in, and that it was in the daytime. He also admitted having taken away defendant's straw. Upon these admissions the court should have directed a verdict. There was no question to submit to the jury. On cross-examination plaintiff testified as follows:

" 'Q. Didn't you see them take away some baled hay or some oats that day ?

" 'A. Took away a little straw.

" 'Mr. Lombard: A little of the straw ?

" 'A. Yes, sir.'

" On rebuttal he testified as follows:

" 'The barn was swept out on Friday, when Mr. Crawford put me out.

" 'Q. Now, on Monday when you got this load of hay, was the straw then—some of your straw—still there in this stable, part of the barn, or where you kept it ?

" 'A. I did not see.

" 'Q. Did you take any of it away on Monday, on that load of hay ?

" 'A. No, sir.

" 'Q. Or on Tuesday ?

" 'A. I took a little of it on Tuesday.

" 'Q. And where did you get it from ?

" 'A. I got it under the stairway.

" 'Q. So it was still there on Tuesday ?

" 'A. Yes, sir; some of Mr. Caplan's with it.'

" The admission of plaintiff that he broke into the barn in the daytime and took away defendant's straw is, in itself, enough to require the court to direct a verdict for the defendant. He took what he claimed to be Mr. Arnstein's straw and ' some of Mr. Caplan's with it.' A felony had been committed, and defendant had probable cause to believe the plaintiff committed it."

An examination of the record shows beyond any possible question that plaintiff denied taking any straw except the straw belonging to Mr. Arnstein. Indeed his claim all the way through was that he went to the barn by the

direction of his employer with the sole and only purpose of getting things which belonged to his employer, and that no other things were taken.

Judgment is affirmed.

HOOKER, McALVAY, BROOKE, and BLAIR, JJ., concurred.